IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    No. 1:08cr12 |
| | ) |
| LINDA WOOLF and | ) |
| DAVID GENGLER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

This case involves the criminal prosecution of two promotional seminar speakers who

marketed stock trading courses offered under the brand name Teach Me To Trade by the

Whitney Information Network, Inc. and its subsidiary Edu Trades, Inc. (referred to collectively

as "the Whitney Company" or "the Company"). On May 7, 2009, following a 16 day jury trial,

defendants Linda Woolf and David Gengler (collectively "Defendants") were convicted of

conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 and three substantive

counts each of wire fraud in violation of 18 U.S.C. § 1343.[1] Currently before the Court is

Defendants' joint motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, initially

---

[1] On March 6, 2008, a federal grand jury sitting in the Eastern District of Virginia returned a 15-count Indictment against Defendants. Count 1 charges Defendants with conspiracy to commit wire fraud and mail fraud in violation of 18 U.S.C. § 1349. Counts 2 through 8 charge Woolf with wire fraud in violation of 18 U.S.C. § 1343. Counts 9 through 15 charge Gengler with wire fraud in violation of 18 U.S.C. § 1343. Also included in the Indictment is a reference to the aiding and abetting statute, 18 U.S.C. § 2, and notice of criminal forfeiture of certain listed properties. At the conclusion of its case-in-chief, the government dismissed Counts 4 through 7, 9, 11, 12, and 15 of the Indictment; and Counts 1, 2, 3, 8, 10, 13, and 14 were submitted to the jury. The jury was also instructed on aiding and abetting liability. The issues pertaining to forfeiture were not submitted to the jury but are the subject of the government's pending Motion of the United States for a Preliminary Order of Forfeiture, with Supporting Suggestions (Doc. No. 311).

made following the close of the government's case-in-chief and renewed following the close of all the evidence.[2]

For the reasons explained below, the Court finds that the evidence as to the conspiracy charge is insufficient to prove that an agreement to violate the law existed or that either defendant knew of and knowingly participated in such an agreement. Accordingly, the evidence is insufficient to sustain Defendants' convictions for conspiracy to commit wire and mail fraud. With respect to the substantive wire fraud counts, the government charged that there existed, integral to the alleged conspiracy, a single, institutionalized scheme to defraud Teach Me To Trade customers. This alleged fraudulent scheme included both Defendants, the Whitney Company's senior management, other seminar speakers, persons who worked for the Whitney Company as "trading mentors," and seminar staff known as "road crews" or "success coaches." The Indictment further alleges that each defendant devised this single, unitary scheme to defraud. The Court finds that the evidence is insufficient to prove that Defendants devised or knowingly participated in the single, unitary scheme to defraud alleged in the Indictment. For that reason, the evidence is insufficient to sustain Defendants' convictions on the substantive offenses of wire fraud. Defendants' joint motion for judgment of acquittal pursuant to Rule 29 made at the close of the government's case is therefore granted.

## I. LEGAL STANDARD

The question before the Court is whether "as a matter of law the government's evidence is sufficient 'to establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144

---

[2] The Court reserved at trial on all Rule 29 motions. Also pending before the Court are Defendants' Joint Supplemental Motion for Judgment of Acquittal or In the Alternative Motion for New Trial and Supporting Memorandum of Law (Doc. No. 314) and Motion for Review of Grand Jury Minutes (Doc. No. 312). In light of this Court's rulings herein, by separate Order Defendants' Motion for Review of Grand Jury Minutes will be denied as moot.

(1986)). That question requires a determination whether, considering the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). In reviewing the sufficiency of the evidence, this Court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *Id*. The Court does not assess the credibility of witnesses and assumes that contradictions in testimony are resolved in the government's favor. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998); *see also United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983).

"The verdict of the jury must be sustained if there is substantial evidence . . . to support it." *United States v. Steed*, 674 F.2d 284, 286 (4th Cir. 1982) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). For the purposes of Defendants' Rule 29 motion made at the close of the government's case, the Court assesses all the evidence as it existed at the close of the government's case-in-chief. Fed. R. Civ. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."). The inquiry, therefore, is whether any rational juror could find the Defendants guilty beyond a reasonable doubt based on all the evidence produced by the government during its case-in-chief, when that evidence is viewed in the light most favorable to the government. *See Tresvant*, 677 F.2d at 1021.

3

## II. FACTUAL BACKGROUND

### A.      Overview of the Indictment

The Indictment in this case charges Defendants with conspiracy to commit wire and mail fraud (Count 1) and with seven counts each of wire fraud (Counts 2 – 15). As alleged in the Indictment, this case stems from events that took place principally between November 2002 and December 2006. Indictment at ¶ 4. During that period, The Whitney Informational Network, Inc. was a publicly traded company headquartered in Cape Coral, Florida. *Id.* at ¶ 1; the Teach Me To Trade ("TMTT") courses were managed through the wholly owned subsidiary EduTrades, Inc., headquartered in Salt Lake City, Utah. *Id.* at ¶¶ 2, 3. Defendants were independent contractors who were compensated through 10 – 15 % sales commissions they earned as TMTT seminar speakers. *Id.* at ¶¶ 4-5.

In Count 1, the Indictment alleges that " Defendants WOOLF and GENGLER, and others known and unknown to the Grand Jury, did unlawfully and knowingly conspire with each other to commit wire fraud and mail fraud. *Id.* at ¶ 11. Under the heading "manner and means of the conspiracy and the scheme to defraud," the Indictment further alleges that as "part of the conspiracy and the scheme to defraud," the Defendants engaged in certain activities. Those activities included that:

- Defendants were speakers at three-day, Company sponsored promotional seminars at which they sold TMTT courses that ranged in cost from $3,000 to $40,000. *Id.* at ¶¶ 12-13.

- Defendants "relied on the Company's fraudulent marketing efforts," which included publicly broadcast "infomercials" and mailings in which Defendants were featured. *Id.* at ¶ 14.

4

-Defendants "falsely represented themselves to be highly successful stock traders" hired by the Company to educate seminar customers based on their experience, expertise and trading success. *Id.* at ¶ 15.

-Defendants "made material false representations and omissions" concerning their trading experience and successes. *Id.* at ¶ 16.

-Defendants made "material false representations and omissions" concerning the Company's "due diligence efforts," the statistical and financial success of TMTT customers, the Company's Trading Mentors program, and Defendants' personal investment in TMTT and other stock trading courses and services. *Id.* at ¶¶ 17-18.

-Defendants "distributed credit card 'scripts' to the seminar attendees . . . which included step-by-step instructions for attendees to contact their credit card companies and maximize their credit limits in order to purchase the TMTT course packages and products." *Id.* at ¶ 18.

-Defendants instructed seminar attendees to bring their retirement and investment portfolios and "used Success Coaches, who were not qualified to give investment advice, to conduct individual reviews of the attendees' retirement and investment portfolios to determine 'how much money is in the room' and to target certain individuals for sales." *Id.* at ¶¶ 19- 20. As to defendant Woolf, the Indictment further alleges that she "recruited and trained" her husband, Trevor Woolf, and also "trained" Gengler and other speakers for TMTT and "taught them to use material false representations and omissions at TMTT seminars in order to increase their sales commissions, which they sometimes shared with Woolf." *Id.* at ¶¶ 23-24

Counts 2 through 8 as to Woolf and Counts 9 through 15 as to Gengler allege that Defendants "having devised the scheme and artifice to defraud described above, and for the purpose of executing the scheme and artifice . . . caused [certain] interstate wire transfers." *Id.* at

¶¶ 29-30.  The Indictment also references liability under the alternative theory of aiding and

abetting under 18 U.S.C. § 2 and also gives notice of the government's intention to seek

forfeiture of certain properties owned by the Defendants.[3]

## B.    Evidence Presented in the Government's Case-in-Chief

The Whitney Company is in the business of selling educational seminars in stock market

trading, primarily through promotional seminars that have been advertised through publicly

broadcast "infomercials" and also through mailings or flyers.[4]  The Company offered to the

public[5] a free one-day seminar that provided a general overview of the TMTT advanced courses

and a follow-on, three-day seminar for a fee, typically $199.  At the three-day seminar, usually

held in the conference room of a hotel, a "fulfillment speaker," using a PowerPoint presentation

supplied by the Company, described the various TMTT advanced course offerings, with a

substantive preview of the material covered.  The full line of TMTT advanced courses were

offered for sale during the seminar and attendees could purchase TMTT advanced courses,

typically by credit card, from a "road crew," also referred to as "success coaches," stationed at

---

[3] The Indictment also states that upon conviction of any of the offenses charged in any of the Counts, Defendants would be required to forfeit, pursuant to Fed. R. Crim. P. 32.2(a) and 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all real and personal property that constitutes or is derived from proceeds traceable to and which defendants obtained directly or indirectly from the commission of those offenses.  Listed in the Indictment are Defendants' personal residences and other real estate, automobiles, and bank accounts.  On June 2, 2006, the government filed the pending Motion of the United States for a Preliminary Order of Forfeiture, with Supporting Suggestions (Doc. No. 311), in which the government seeks entry of an order forfeiting the properties listed in the Indictment and authorizing their seizure and also a money judgment, "jointly and severally," against Defendants in the amount of $8,432,561.36, which is claimed to be the total aggregated amount of commissions earned by the both Defendants, to be satisfied out of the seized properties.

[4] See Gov. Ex. I-2.  The flyer placed in evidence contains testimonials, presented through quotations from various individuals concerning the success and benefits they experienced from using the Teach Me To Trade system.  These individuals included Woolf, Gengler and John Hyland, another seminar speaker that testified under immunity, and also eight other individuals who did not testify and about whose statements there was no evidence as to their truth or falsity.

[5] A wide range of people attended the seminars and purchased courses, including people who could be fairly described as novice investors, but also doctors, lawyers, business owners, as well as stock brokers and licensed traders.

the rear of the seminar room. Shortly after a three-day seminar, the Company telephoned certain customers who had purchased advanced courses in order to sell them the services of a "phone coach." Defendants Woolf and Gengler, together with more than a dozen other persons, were independent contractors that worked for the Company as "fulfillment speakers" at these three-day seminars and were compensated through sales commissions in the amount of 10 – 15 % of the revenue generated from the advanced courses that were purchased at the seminars they taught.

The TMTT advanced course offerings ranged from individual courses to various packages of multiple courses, promoted under such names as the Platinum or Gold package. [6] Prices were listed as ranging from $3,000 to more than $40,000, but attendees received a discount of approximately fifty percent for courses purchased during the three-day seminars and two people could purchase the courses together, thereby cutting the cost per person in half. *See* Gov. Exs. I-3 and I-4. For example, the Platinum package, with a cost of approximately $20,000, consisted of four courses to be taken in sequence over the course of a year, together with two days with a "mentor" in what was called the Trading Mentors program. [7]

At their seminars, Defendants described the Trading Mentors program as a critical part of the TMTT formula for successful stock trading and recommended the program as the most effective path to becoming a successful stock trader. [8] The Trading Mentors program involved a

---

[6] The advanced courses went by such names as Master Trader™, the Trading P.I.T. ™, the Advanced P.I.T. ™, H.I.T.S. ™ (Hedging and Institutionalized Tactics and Strategies), the Trading Room™, Advanced Covered Calls, the Personal Mentor, and Asset Protection and Tax Relief. See Gov. Ex. I-13.

[7] Approximately 15 - 20% of the people attending a three-day seminar made some purchase, with typically less than 5% of those attending purchasing the Platinum or more expensive packages.

[8] In pre-trial proceedings, the government told the Court that the Trading Mentors program was a "core" of the government's case. It also described the Trading Mentors program as "a sham service designed, implemented and maintained by convicted felon Roger Scott Stokes, now serving a five year sentence for conspiring to defraud the United States [on charges unrelated to the alleged scheme to defraud]." Gov. Mem. in Opp. to Defendants' Joint

student's purchase of time with a mentor, also an independent contractor, who would meet with the student and assist the student in learning how to trade stocks.[9]  The Defendants described the individuals who served as mentors as experienced stock traders, whose success as traders had been verified by the Company.  The Defendants did not serve as trading mentors or phone coaches and their only contact with TMTT customers was during the three-day seminar that each defendant taught, with the one exception that Woolf, during some period of time, also taught the TMTT advanced course on options trading.

In its case-in-chief, the government presented a total of 25 witnesses.  To prove that Defendants made the statements claimed to be misrepresentations,[10] the government did not rely on the PowerPoint outline that the seminars revolved around, but rather on Defendants' statements outside of the PowerPoint outline.  In order to establish those statements, the government called thirteen witnesses who had purchased TMTT courses after attending one of the Defendant's three-day seminars.  It also introduced certain excerpts from certain videotaped seminar presentations by Woolf and Gengler and two "infomercials" the Company produced in 2005.[11]  *See* Gov. Exs. G-1 – G-7 (videotaped excerpts) and Gov. Exs. 706 (infomercial

---

Motion to Dismiss the Indictment (Doc. No. 81) at 7.  Mr. Stokes was not called to testify at the trial and there was no evidence of any statements by or communications with Mr. Stokes.  The government also described the trading mentors themselves as "unqualified hacks and con artists who could talk a good game" and claimed that the Defendants' statements about the Trading Mentors program, as well as other misstatements, "were part and parcel of a choreographed campaign to dupe the seminar attendees into spending thousands of dollars on sham services and worthless services - one never intended to be provided." *Id.* at 7, 8-9.

[9] The typical routine followed during the sessions with a trading mentor was for a student to observe the mentor engage in his own stock trades; and then, under the supervision of the mentor, the student would engage in "virtual trades," that is, simulated trades without making actual purchases and sales of stock.

[10] The Indictment alleges only one specific misrepresentation – that Defendants falsely represented themselves to be "highly successful traders." Indictment at ¶ 15.  The Indictment otherwise alleges that Defendants made false representations and omissions as to general subjects, without specifying the specific false statement or omission. *See* Indictment at ¶¶ 16-17.

[11] One of the infomercials featured Woolf for approximately five minutes as part of an approximately thirty minute presentation and another featured Gengler for approximately five minutes as part of an approximately twenty-five

involving Gengler) and 707 (infomercial involving Woolf). Theses witnesses, corroborated in some instances by the video recordings,[12] recounted Defendants' statements at the seminars they attended concerning Defendants' experience, expertise and trading successes, including specifically that Defendants "made their living in the market," were "professional traders," and were "successful traders," with specific examples of successful trades they had made over the years. They also recounted Defendants' statements about the particular hardships in their lives that stock trading had allowed them to overcome; and that Defendants themselves had paid tens of thousands of dollars on stock trading courses and a mentor. Some of the customers testified that Defendants had led them to believe that they could achieve or duplicate Defendants' "paths to success" and obtain a certain lifestyle and financial independence as a result of trading. Some customers recalled telephone calls they received from the Company shortly after they purchased TMTT advanced courses selling the services of a "phone coach." These customers also testified that they considered Defendants' statements about their backgrounds and experience as an important part of their decision to purchase TMTT courses. The testimony from those who observed the Defendants' presentations consistently estimated that Defendants' statements about their personal backgrounds, trading experience, and successes constituted approximately fifteen to thirty minutes of the three-day, twenty-four hour program.

During their presentations, Defendants touted the prospects for profitable trading by following the Company's "recipe" and proffered that students simply needed to follow the "recipe" in order to be "successful." In that respect, the government presented evidence that in 2004, the Company's President, Russ Whitney, told seminar speakers to use the statistic that

minute presentation. During their presentations, both talked about their backgrounds, lifestyles, and their successes as traders.

[12] None of these excerpts were of the seminars listed in the Indictment's substantive wire fraud counts that went to the jury. *See supra* note 1.

96.5% of those students who purchased the Platinum package or higher were "successful."[13]
There was no evidence that the Company ever defined "success" for the purposes of the "success
rate"; but on at least one occasion, Woolf defined "success" as making $100,000 in the first year
of trading using the TMTT method and Gengler defined "success" as making more than the
$20,000 cost of the Platinum package.  The government also introduced an e-mail dated
December 6, 2005 sent to both Defendants and other seminar speakers by an employee of the
Company, which told seminar speakers to cease using the success rate.[14]  There was evidence
that both Woolf and Gengler continued to reference the success rate at certain seminars after
December 2005.[15]

Customers also testified as to their own lack of success in using the knowledge and
techniques presented in the advanced TMTT courses they purchased and the TMTT software
they received.  Some testified that they were unhappy or dissatisfied with the courses.[16]  Others
praised the content of the courses.  Likewise, at least one customer expressed her unhappiness
with Gerald Abrams, one of the trading mentors, while others were very complimentary of Mr.

---

[13] While some witnesses testified to hearing the success rate given at seminars without limiting its application to those who had purchased the Platinum package or higher, the government does not dispute that Defendants and the Company tied the success rate to those students who purchased the Platinum package or higher.

[14] *See* Gov. Ex. O-3.  The e-mail stated:

> Speakers, please do not reference the "96 % Success Rate" statistic. It's outdated, was created for the Real Estate division and actually was never quite confirmed. Duane [Gibbs] is working with Rebecca [Taggert] in getting some numbers and statistics for the stock side to use in their presentations and sales. We will be sending these out as soon as they are completed.

The e-mail was sent by Cari Nau, Stock Education Division, Whitney Education Group, Inc.  Ms. Nau was identified at trial as an administrative staff person.  She was not called to testify and she was not identified by the government as an unindicted co-conspirator who sent this e-mail in furtherance of the conspiracy.  Nevertheless, the e-mail is admissible to establish that the Defendants were told by the Company to cease using the success rate.

[15] This evidence came from Duane Gibbs.  He could not recall the number of times that Gibbs or Woolf referenced the success rate in his presence after December, 2005, but he told both defendants more than once to stop using the success rate before they stopped.

[16] One customer complained that there was "too much information"; another stated that the material was not understandable.  One thought the courses were a "bait and switch."

Abrams. Witnesses also admitted that Defendants told them that the courses required at least a

year of concentrated effort in order to achieve the ability to make money in the stock market,

although once that was achieved they, like Defendants, would only need to spend approximately

twenty minutes a day trading.   Witnesses also admitted that, for one reason or another, they had

been unable to either complete all the course work, attend all the classes, or devote the time that

they had been told would be necessary to be successful. Some also testified, however, that they

had diligently devoted themselves for some time, as instructed, until it became apparent to them

at a certain point in advance of completing all the course requirements that they would never

achieve the expected level of success no matter how diligent they were.[17]

Witnesses also consistently acknowledged that Defendants said that there were no

guarantees in the stock market, that the TMTT system would only reduce—not eliminate—stock

market risk, that traders could lose as well as make money, and that they had lost as well as made

money.  Some customers recalled specific written disclaimers that were made during the seminar

about future success in stock trading.  In evidence was the TMTT standard contract for the

purchase of courses that included disclaimers as to future success and also the customer's three-

day right of rescission.  *See* Gov. Ex. 601.  These customers also consistently testified regarding

the large amount of substantive information that each defendant conveyed at the three-day

seminars about the stock market and stock market trading, as Defendants outlined the material

that would be covered in more depth in the advanced TMTT courses.  Witnesses uniformly

---

[17] During their case following the close of the government's case-in-chief, Defendants called seminar customers who testified that they had generated trading profits using the techniques they learned in the TMTT advance courses they had purchased at one of the Defendants' seminars. One witness testified that the courses had "changed my life."

acknowledged the effectiveness of Defendants' presentations and the impressive depth of knowledge Defendants demonstrated regarding the stock market and stock trading.[18]

In its effort to prove the falsity of Defendants' statements at the seminars concerning their backgrounds, experience, expertise, and trading success, the government, through various witnesses, introduced Defendants' tax returns, the tax returns of closely held companies affiliated with the Defendants, and certain of Defendants' trading records that had been produced to the Securities and Exchange Commission in response to subpoenas.[19] *See* Gov. Exs. B-2 (SEC subpoena); B-5, B-7, B-9-12, B-14, B-16-17, B-19-22, E-4- E-11, E-13, E-40-48 (Woolf related 1996-2006 tax returns); C-4, C-6-8, C-11, C-13, C-14, E-18-23, E-25-33, E-35-38 (Gengler related tax returns); and D-1, D-3, D-8-29 (trading records). These records showed that after they became seminar speakers for the Company, Defendants earned a large percentage of their income, not through stock trading, but through commissions earned from speaking at TMTT seminars. *See also Gov.* Exs. I-15-17.[20] These records also showed that overall Defendants lost money or had very modest gains in the stock market.[21] Nevertheless, the trading records also

---

[18] One of the customers was a retired high school Latin teacher who testified as to how impressed she was with defendant Woolf's pedagogical skills. Other witnesses were equally laudatory as to both Defendants. The government itself characterizes Woolf in particular as "dynamic and effective." Gov. Mem. in Opp. to Defendants' Motion for Judgment of Acquittal (Doc. No. 329) at 4.

[19] These witnesses included employees of the United States Securities and Exchange Commission, the Internal Revenue Service, the Federal Bureau of Investigation and Defendants' tax return preparers.

[20] These exhibits show that for the period December 2003 through November 2006, Woolf received from the Company gross commissions of approximately $3.6 million and Gengler, approximately $2.7 million.

[21] The government relied substantially on Schedule D of Defendants' tax returns to support its claim that Defendants had misrepresented themselves as successful stock traders. The evidence showed, however, that the much of Defendants' market trading occurred in options transactions, either "puts" or "calls," in which the underlying stock was never actually purchased or sold and that the results of these transactions were not reflected in their tax returns on Schedule D, which appears to be limited to transactions where a stock was actually purchased or sold. The government introduced several summary exhibits that were based on both Defendants' tax returns and also their trading accounts generally. *See* Gov. Exs. X-6 and X-7 (as to Woolf) and X-8 and X-9 (as to Gengler).

showed that each defendant had been an active trader before associating with the Company,[22] and that Defendants remained active traders throughout the time they were TMTT seminar speakers, albeit with periods of little or no trading. Overall, these trading records showed that in the aggregate each defendant had engaged in hundreds of thousands, if not millions, of dollars of stock market transactions, including both stock and options trades. The trading records also showed that each defendant was, at various times, "successful," in that they made money on certain stock or options transactions.[23]

The government also presented the testimony of five government immunized witnesses who were at one time employed or otherwise associated with the Company. These witnesses included Duane Gibbs, one of the Company's road crew senior managers who witnessed Woolf and Gengler's presentations;[24] Laura Moak and Alysia Fronk, who worked as road crew members at seminars taught by either Woolf or Gengler; John Hyland, another three-day seminar speaker; and Gerald Abrams, a TMTT trading mentor. Gibbs, Moak, and Fronk confirmed that Defendants made many of the statements at seminars about which other witnesses had testified and also testified that Woolf and Gengler's own particular presentations were generally "the same" or "similar" each time. These witnesses confirmed that Defendants introduced the road crew members as "success coaches" and on occasion described them as "successful traders" or "experienced," a description they thought was not accurate as to themselves or certain other road

---

[22] For example, as part of the customer agreement completed by Linda Woolf and her husband Trevor for their trading company, Optional Investments, the Woolfs disclosed in August 2001 that their previous experience included five years of stock and options trading, with approximately 150 options trades a year and 300 stock trades a year. *See* Gov. Ex. D-8 (Bates No. Pension-000000117).

[23] These trading records showed that Defendants had, in fact, made impressively profitable trades, amounting to hundreds of thousands of dollars in profits, only to engage in equally impressive losing transactions.

[24] Gibbs, without any contrary evidence, testified that he was "just a salesperson," that his supervisor was Rance Mashek who oversaw marketing, and that neither Woolf nor Gengler was involved in marketing beyond their seminar speaking.

crew members[25] and which they thought misled customers. Gibbs and Moak acknowledged, however, that many of the road crew members were in fact traders, including Moak who had sometimes sought out trading advice from Woolf, and that the Company encouraged the road crew members to take all of the TMTT advanced courses, which many did. Gibbs also testified that he never lied to customers, that the Company never told the road crew to lie to customers, and that as far as he knew as a manger of the road crews, no one on the road crew ever lied to customers.[26] He also testified, as did Moak, Fronk, and Hyland, that the road crew did not provide investment advice. Fronk testified that she never heard Woolf or Gengler describe her as a "successful trader" or a "trader" and that she affirmatively told customers that she was not a "professional trader."

Other than customers' comments about their personal experiences with trading mentors, the government's evidence concerning the Trading Mentors program came from Gerald Abrams and Duane Gibbs. Abrams, the only trading mentor to testify, testified that he lied to his mentoring students about his own background and experience and that some of the other trading mentors that he knew were "beginners like himself." Abrams further testified, however, that the Company correctly portrayed him in its marketing materials as an example of a former TMTT student who became a mentor,[27] that he never told the Company or the Defendants that he was lying or misrepresenting his experience to students, and that the mentoring services that he

---

[25] The composition of the road crews was determined at the time each seminar was scheduled and often changed with respect to a particular speaker from seminar to seminar. A road crew for a particular seminar consisted typically of one "success coach" for every 20-25 seminar attendees.

[26] Gibbs did testify that on one occasion it was reported to him that one of the road crew members had misrepresented his background to a customer, in response to which Gibbs located the customer and corrected any misinformation the customer may have received. Hyland, capturing the slickness of the road crew's sales techniques, testified that it was a standing joke within the Company that the road crew came from "Smoothie King."

[27] These materials also accurately disclosed that while he was serving as a mentor he was also working as an active duty police officer.

provided were "substantive," "valuable," and of the quality the Company represented to the customers. Abrams further testified that he had traded profitably after taking the advanced TMTT courses and using a TMTT trading mentor and the Company, before hiring him as a mentor, verified his trading success.[28]  In fact, Abrams testified that since leaving the Company, he has continued to provide stock trading mentoring services to former TMTT students, including some who first hired him while he worked for the Company. Abrams did not recall ever meeting or talking with Woolf and his only contact with Gengler was during the three-day Gengler taught seminar that he and Hyland attended. Gibbs testified that the mentors were in fact experienced traders and that in operating the Trading Mentors program, Company executive Scott Stokes, who hired and supervised the mentors, "did the right thing" and went "by the book."

As for the three-day seminar speakers, seminar-speaker John Hyland testified that the three-day seminar speakers were not the highly experienced, successful, professional traders that the Company represented them to be and that he had lied to students about his own qualifications to serve as a seminar speaker. Like Abrams, he also conceded, however, that he never disclosed to either the Company or Defendants that he was lying to students. There was no evidence of any communication between Hyland and the Company regarding any inaccuracies in how he or anyone else was introduced or described. There was also no evidence concerning the specific qualifications or lack of qualifications of other trading mentors or seminar speakers other than Woolf, Gengler, Hyland, and Trevor Woolf or what the Company knew or did not know about its corps of three day seminar speakers.

The government also presented the testimony of Paul Cook and Chad Miller. In videotaped portions of seminars, Woolf spoke about her mentor "Paul," whom she had paid

---

[28] Between 2003 and 2006, Abrams experienced 17% or higher annual returns through his trading activities.

$10,000 for his mentoring services. Similarly, Gengler spoke of his mentor "Chad," whom he had paid $10,000 to be his mentor. Cook confirmed that he knew Woolf when she was training to be a seminar speaker in the Wade Cook organization before she associated with the Whitney Company, but that he never served as her "mentor" and that she never paid him to be a mentor. Miller testified that he was the founder of Maverick Trading and knew Gengler when he worked at Maverick as a stock broker. Maverick Trading had created stock market trading courses under the name Teach Me To Trade before selling those courses to the Whitney Company in 2002 for approximately $2 million.[29] Though Miller conceded that he had provided advice to Gengler on how to day trade and Gengler had taken some of the Teach Me To Trade courses that Maverick offered, it was not accurate to describe him as Gengler's "mentor" and Gengler never paid him to be his mentor.

The government closed its case-in-chief with Special FBI Agent Joanne Altenberg, who played a lead role in the investigation of the Whitney Company and Defendants. She testified that the investigation into the Whitney Company had been underway for approximately two years and that through grand jury subpoenas, she and others involved in the investigation had reviewed over four million, and perhaps as many as six million, documents, including electronic documents contained in the Company's computers. Altenberg testified, among other things, that during her investigation she found no evidence that supported Defendants' statements at seminars concerning their experience in the market. She also acknowledged that she could not verify as either true or false certain of Defendants' other claims or statements, including the

---

[29] Miller also testified that Maverick had produced an infomercial regarding its Teach Me To Trade courses featuring Gengler. In the infomercial, which was included in the sale of the Teach Me To Trade program to the Whitney Company, Gengler claimed that he had turned $10,000 into $20,000 in two weeks, which Miller testified he had verified.

96.5% success rate that Defendants referenced at their seminars, principally because the term "success" was undefined.

## III. ANALYSIS

### A.    Conspiracy to Commit Wire and Mail Fraud

Count 1 of the Indictment alleges that Woolf and Gengler conspired to commit mail and wire fraud. In order to sustain their convictions on that charge, the evidence must be sufficient for a rational juror to find beyond a reasonable doubt the following: (1) that there was an agreement to commit wire or mail fraud; (2) that the defendants knew of such an agreement and willingly participated in it; and (3) that there was an overt act in furtherance of the agreement. *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999) (citing *United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994)); *United States v. Falcone*, 311 U.S. 205, 210 (1940) ("Those having no knowledge of the conspiracy are not conspirators."). Finally, conspiracy to commit mail or wire fraud also requires that the government show that the defendants acted with a specific intent to defraud. *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993).

Courts recognize that a conspiracy is often, by its very nature, "clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947) and *United States v. Wilson*, 721 F.2d 967, 973 (4th Cir. 1983)). Thus, a conspiracy generally is proved, not on the basis of direct evidence, but by circumstantial evidence and reasonable inferences. *Id.* (citing *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) and *United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994) (per curium)). Nevertheless, while evidence of an express or formal agreement is not required to sustain a conspiracy conviction, *United States v. Anderson*, 611 F.2d 504, 511 (4th Cir. 1979), there must be evidence to conclude

17

beyond a reasonable doubt that an agreement to commit mail or wire fraud in fact existed, that

defendants knew of that agreement and that defendants willingly participated in the conspiracy.

The conspiracy and defendants' participation in it must be more than mere speculation and

conjecture. *See, e.g., Harms v. United States*, 272 F.2d 478, 483 (4th Cir. 1959) ("circumstantial

evidence is equally available with direct evidence to prove the conspiracy, but suspicion or

conjecture cannot take the place of evidence."). For the reasons discussed below, the evidence at

the close of the government's case-in-chief, viewed in the light most favorable to the

government, was insufficient to allow a rational juror to conclude that there existed an agreement

to commit wire or mail fraud. It was also insufficient to prove that either defendant knew about

any such agreement and willingly participated in a conspiracy formed by any such agreement.

The government identifies the conspiracy alleged in the Indictment as one between the

Company and the Defendants, or at least one of the Defendants, or between the Defendants

themselves. [30] Accordingly, to sustain a conviction on Count 1, there must be evidence sufficient

for a rational juror to find beyond a reasonable doubt that there was an agreement to commit wire

or mail fraud between the Company and Defendants, or at least one of the Defendants, or

between Defendants themselves. As the government concedes, there is no direct evidence of an

---

[30] In its opening statement on April 13, 2009, the government described the conspiracy charged in the Indictment as "an understanding between the two of them [*i.e.*, Defendants] to defraud the seminar attendees, to deceive them, to cheat them." Tr. of Apr. 13, 2009 proceedings (Doc. No. 303) at 13:12-14. During oral argument on Defendants' Rule 29 motion, held at the close of the government's case-in-chief on April 24, 2009, the government, in response to the Court's questions concerning the nature of the conspiracy, stated that the conspiracy was "simply the Company, including these Defendants ma[king] material false representations concerning [the Defendants'] trading expertise, financial success, and [the Company's] products and services." In its closing argument on May 6, 2009, the government told the jury that "on a larger scale," the conspiracy consisted of the Company's use of a standard presentation to promote a system that the Company claimed guaranteed a 96% success rate, its use of allegedly experienced traders as success coaches, and its use of a falsely advertised mentor program, and "on a smaller scale," the conspiracy consisted of "the individual spokes" involving Gengler, Linda Woolf and Trevor Woolf. As to the latter claimed "smaller scale" conspiracy, the government conceded in oral argument on April 24, 2009, that it needed to prove that that the claimed conspiracy between Linda Woolf and her husband Trevor Woolf was part of the "overarching single conspiracy."

agreement to violate the law in this case. But fatal to the government's position is that there is no evidence from which any inference of such an agreement could be reasonably drawn.

1.     Coordinated Sales Activities

In certain circumstances, courts have found an agreement for the purposes of a criminal conspiracy where there is concerted or coordinated sales activity. *See Burgos,* 941 F.3d at 860. This case is fundamentally different, however, from those conspiracy cases where the products sold were inherently fraudulent or illegal. For example, in a drug conspiracy case, such as *Burgos*, the sale of the product itself is illegal, such that coordinated sales activity is probative of a conspiracy or agreement to commit a crime. Likewise, where the product is known to be worthless, as in *United States v. Lyons Capital, Inc.*, 238 F.3d 416, 2000 WL 1792985 (4th Cir. 2000) (per curium), its sale is inherently fraudulent and an agreement to sell the product is probative of an agreement to commit a crime. Where, however, the sale of the product itself is not illegal or inherently fraudulent, an agreement or a common goal to sell that product, by itself, does not permit a reasonable inference that there is an agreement to commit a crime or violate the law. In such circumstances, courts have undertaken a more searching inquiry beyond whether there was a shared goal to sell the product. *See, e.g., United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988) ("The appellants certainly directed their efforts toward the common goal of making money for themselves and their employer. But to support a conspiracy conviction, the evidence must establish a common agreement to violate the law.").

In this case, there was no evidence from which a rational juror could conclude that there existed an illegal agreement based solely on the fact that Defendants participated in the sale or marketing of TMTT advanced courses. The evidence is insufficient for a rational juror to find that the TMTT courses were inherently worthless or sham products, whose sale was either itself

19

illegal or inherently fraudulent. The witnesses who attended Defendants' seminars consistently

testified that the three, eight-hour sessions provided a large amount of substantive and useful

information concerning the nature of the TMTT advanced courses offered, the securities markets,

and various trading terms and techniques. Likewise, the advanced courses were praised for their

content.[31] There was no evidence that the TMTT advanced courses sold at the seminars did not

in fact exist[32] or presented incorrect information or that anyone who purchased them did not

receive the courses they had purchased. Likewise, there was no evidence that the TMTT courses,

while expensive, were overpriced by some measure.[33] There was uncontradicted evidence that

the Company honored a customer's right of rescission and that it had a refund policy. Similarly,

the evidence is that the Trading Mentors program in fact existed and there is insufficient

evidence to conclude that the Trading Mentors program was worthless or a sham.[34] In short, the

TMTT courses sold at the seminars were real courses and legitimate products; and an agreement

---

[31] Specifically, Duane Gibbs testified that the advanced courses were real, substantive, and of a high quality and were taught by "professional traders." Likewise, John Hyland, another fulfillment speaker, testified that he believed in the TMTT course offerings and spent thousands of dollars in taking the TMTT courses himself. Even customers who testified that they were unhappy about their trading results nevertheless conceded that the classes did in fact exist, they took them, and they learned from them.

[32] There was testimony from Alysia Fronk that at one point at the beginning of the TMTT marketing efforts in 2002 or 2003, one course listed on the sheet of available courses distributed at seminars was not immediately available. She also testified that as far as she knew that course was in fact offered to any person who purchased it. There was no evidence that anyone actually purchased that course before it existed or that anyone who purchased the course did not receive it. To the extent that this one course offering was in anyway misrepresented, such a misrepresentation was not a material one.

[33] John Hyland testified that before he and Gerald Abrams purchased TMTT advanced courses, they investigated what other stock trading courses were available from other companies and found that all such courses were similarly priced.

[34] Some customer-witnesses testified that they did not find the mentoring helpful, while others did. This kind of dissatisfaction, however, does not allow the reasonable inference that the Trading Mentors program was inherently fraudulent. As discussed *infra* Section II.B, the government's evidence concerning the qualifications of the Trading Mentors program came from Duane Gibbs and Gerald Abrams. In addition, Special Agent Altenberg testified that as part of her investigation, she had interviewed a group of trading mentors, which included persons who worked on the trading floor of the New York Stock Exchange, were members of various stock exchanges, held various types of brokers' licenses, and claimed to have engaged in thousands of trades.

to commit wire fraud or mail fraud cannot be inferred from the mere fact that the Defendants agreed to market and sell the TMTT courses.

2.   Evidence of Defendants' Communications and Associations With Each Other and the Company

As the government argues, proof of a conspiratorial agreement can also be shown through circumstantial evidence pertaining to the relationship among members of the conspiracy and their length of association. *See* Gov. Mem. in Opp. to Defendants' Motion for Judgment of Acquittal (Doc. No. 329) at 18; Gov. Mem. of Law Regarding Scheme to Defraud, Conspiracy and Rule 29 (Doc. No. 261) at 6 (citing *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984) and *United States v. Lyons Capital*, No. 99-4178, 2000 WL 1792985, at *3 (4th Cir. Dec. 7, 2000); *see also Burgos*, 94 F.3d at 858 (quoting *Collazo*, 732 F.2d at 1205) (Circumstantial evidence such as Defendants' "'relationship with other members of the conspiracy, the length of this association, [Defendants'] attitude [and] conduct, and the nature of the conspiracy'" may be sufficient to support a conspiracy conviction.). However, in this case, the evidence concerning those aspects of the Defendants' relationship with each other is insufficient to support the inference that they had entered into a criminal conspiracy.

There is no evidence that Woolf and Gengler knew each other before they both first associated with the Company towards the end of 2002; and other than their brief interactions in December 2002, discussed below, there is no evidence that either Woolf or Gengler were in each other's presence except at routine Company-wide meetings, which the government does not rely on to establish its case.[35]  Nevertheless, the government contends that the interactions between

---

[35] These internal, periodic Company-wide meetings included periodic meetings and monthly telephone conferences with seminar speakers when the previous month's results were reviewed and monthly summaries of the results of seminars were provided.  There is no evidence that these communications were anything other than legitimate business activities that occurred in the ordinary course of business.

Woolf and Gengler in December 2002 are sufficient to support an inference that a criminal conspiracy was formed at that time and carried forward through December 2006.

In December 2002, as part of his training as a speaker, and without any other prior involvement with the Company, Gengler attended a seminar and observed Woolf speak. Thereafter, on two separate occasions in December 2002, in San Diego, Gengler taught limited sections of a Woolf seminar. There is no direct evidence concerning how Gengler came to attend those seminars or precisely what Woolf said and what Gengler heard at those two seminars, or vice versa. There are no recordings or witness testimony regarding the specific content of those December 2002 seminars. The only testimony from anyone who witnessed those seminars came from Duane Gibbs, who testified that Woolf's presentations were always "the same." The government argues that from this testimony, when coupled with evidence of Woolf's misrepresentations at other, later seminars as to which there is evidence of specific statements, one can reasonably infer that (1) Woolf misrepresented that she had paid for TMTT courses and a TMTT mentor in Gengler's presence in December 2002, and (2) Gengler knew those misrepresentations were necessarily false since he knew that TMTT courses were not offered by the Whitney Company before the end of 2002, when the Company purchased the TMTT program from Maverick, Gengler's former employer. From these inferences, the government claims one can further reasonably infer the existence of an agreement between Woolf and Gengler to commit mail fraud or wire fraud. The government's position fails.

First, there is no evidence that as part of her standard presentation at her seminars Woolf actually said that she paid for TMTT courses or a TMTT mentor. Rather, the evidence is that she said she had taken comparable stock trading courses and had used a mentor, not that she had

22

taken or paid for TMTT courses or a TMTT mentor.[36]  Second, there is no evidence that Gengler

had any information about Woolf's background, training, or experience from which he would

have necessarily known anything Woolf said was false. Third, there is no evidence of any

communications or other substantive interactions between Woolf and Gengler at those December

2002 seminars other than the fact that they were in each other's presence. There is simply

insufficient evidence to find an agreement between Woolf and Gengler to commit a crime based

on the December 2002 seminars.

There also is insufficient evidence from which a rational juror could conclude that Woolf

and Gengler entered into an agreement to commit a crime based on their communications or

associations after Gengler attended Woolf's seminars in December 2002. As confirmed by FBI

Agent Altenberg based on her investigation, there is no evidence that Woolf and Gengler worked

together or otherwise saw each other's presentations after December 2002. There is no evidence

that Woolf and Gengler ever taught together or shared commissions after December 2002

through the end of the alleged conspiracy period. There is also no evidence that Woolf and

Gengler discussed or coordinated their respective seminar presentations after 2002. In fact, there

is no evidence of a single conversation or meeting between them where they exchanged any

information about their seminars, experiences, or their training, how or what they taught or said

at their seminars, or their intentions as to marketing.

Likewise, there is no evidence from which a rational juror could conclude that an

agreement existed between the Company and Woolf and/or Gengler. The government claims

---

[36] This evidence comes from the video recordings of Woolf's seminars placed into evidence and also from John Hyland and Laura Moak who testified that Woolf did not say she took the TMTT courses but rather that she took other similar courses. The government conceded as much during argument on Defendants' Rule 29 motions following the close of the government's case-in-chief, but claimed that these statements were misleading to customers. Even were Woolf's statements considered misleading, as the government contends, theses statement do not provide a sufficient evidentiary basis to infer an agreement between Woolf and Gengler in December 2002 to fraudulently market TMTT courses.

that an agreement between the Company and Woolf and/or Gengler to fraudulently market or sell products can be inferred from evidence that all of the Company's speakers were trained by Woolf and made the same fraudulent misrepresentations, including specifically (1) a "rags to riches" story; and (2) the 96.5% success rate.[37]   *See, e.g.*, Gov. Mem. in Opp. to Defendants' Motion for Judgment of Acquittal (Doc. No. 329) at 18 (citing *Lyons Capital*, 2000 WL 1792985 at *3, for the proposition that Defendants' similar conduct points to the existence of a conspiracy).

First, there is no evidence that Woolf "trained" speakers in any sense that would support an inference of a conspiracy. The evidence is that the Company recommended that new speakers should observe Woolf's presentations because she was a "great speaker" and a "performer." There is no evidence that the Company instructed the seminar speakers to mimic the personal aspects of Woolf's presentation or to say anything specifically other than to use the 96.5% success rate, the credit card script, and the substance of the PowerPoint presentation the Company distributed to speakers. There also is no evidence that Woolf ever instructed anyone to say anything that the government claims was fraudulent, or even what to say in any respect or how to say it. [38]

The insufficiency of this body of evidence to establish a conspiracy is starkly illustrated by John Hyland's testimony. After attending with Gerald Abrams a three-day seminar taught by

---

[37] The Indictment also alleges that the Company provided seminar speakers with the script concerning the use of credit cards, but the government does not contend that the credit card script itself was fraudulent.

[38] The only evidence of Woolf's involvement in Company-wide training outside of her own seminar presentations was that she made a presentation at a Company retreat, the substance of which the government does not rely on for its conspiracy and fraud claims.

Gengler, Hyland and Abrams purchased nearly $30,000 of TMTT courses,[39] including time with

mentors. Hyland was subsequently hired as a member of the road crew. When he decided he

wanted to be a seminar speaker, he asked Rance Mashek, a Company executive who supervised

marketing for TMTT, how to best go about training to be a speaker. Mashek told him to watch

Woolf. Hyland attended one of Woolf's presentations and also purchased a videotape of her

presentation, which he watched repeatedly for months. He then developed his own presentation,

which mimicked Woolf's, down to her mannerisms. Like Woolf, he used a "hard luck" story

and portrayed himself as a successful, professional trader, who made a living in the stock market,

all of which he admitted were, in his mind, lies.[40] He conceded, however, that he, in fact, was

down and out financially when he first signed up for the TMTT seminars, that he never told

Woolf or the Company that he mimicked Woolf, that he never told Woolf, Gengler, or the

Company that he was lying, that he did not know whether Woolf or Gengler knew he was lying,

and that he did not know whether anything he had heard Woolf or Gengler say was untrue.

Second, there is insufficient evidence to support the claim that *all* TMTT seminar

speakers made the same or similar misrepresentations. The government never proved the precise

number of three-day seminar speakers, but the evidence established that there were a substantial

number of three-day seminar speakers in addition to Woolf and Gengler.[41] The only seminar

speakers whose specific statements at seminars were placed into evidence, other than Woolf and

---

[39] Hyland testified that after the three-day seminar, Abrams purchased two courses and time with a mentor (which under the Company's policies, they both could attend without additional charge), but that after they attended some or all of those classes, they purchased additional courses.

[40] Hyland testified that he did trade and that while he did not lose money, he did not make money, unlike co-attendee and TMTT mentor Abrams, who Hyland described as a "great trader."

[41] The only evidence in that regard is Hyland's testimony that there were "many more" or "a lot more" than six speakers; and the documentary evidence that reflects 14 or 15 road crews assigned during various periods to different seminar speakers, which suggests at least that many seminar speakers.

Gengler, were John Hyland[42] and Trevor Woolf.[43]  The government does not rely on the

substance of the PowerPoint presentation or the credit card script to infer a conspiracy or scheme

to defraud.  Rather, the government relies on evidence it contends shows that all the speakers

similarly misrepresented their backgrounds, experience, and trading success.  But the only

evidence of what speakers other than Woolf and Gengler said, outside of the PowerPoint or the

credit card script, was Hyland's brief and conclusory testimony that all the speakers gave their

"hard luck story." [44]  There was no evidence concerning how many speakers Hyland had

observed, or even what specifically other speakers said that was, in fact, fraudulent or even

untrue or inaccurate.  There was no evidence from which one could reasonably conclude that

even these alleged "hard luck stories" from other speakers were untrue, especially since there

was insufficient evidence during the government's case-in-chief that Woolf and Gengler's own

hard luck stories were materially false;[45] and Hyland himself confirmed his own misfortunes that

---

[42] Hyland was a seminar speaker, not for TMTT, but Star Trader, another division or affiliate of the Whitney Company, whose courses were similar, but not identical to TMTT courses.  The Star Trader brand emphasized options trading as opposed to TMTT's emphasis on stock trading.  Hyland testified that the Company provided PowerPoint presentation he used as a Star Trader speaker was similar but not identical to the PowerPoint presentation used by TMTT speakers.

[43] The evidence as to Trevor Woolf was that he co-taught perhaps as many as five seminars with Linda Woolf.  As with Linda Woolf's seminars attended by Gengler, there is no specific testimony concerning what Linda Woolf said in Trevor Woolf's presence or vice versa.  Duane Gibbs, the only witness to testify as to these seminars, testified that while Linda Woolf was speaking, Trevor was out of the room.  There is no direct evidence of any specific communications between them and the only direct evidence of what Trevor said at his seminars is that he "made a living" in the  stock market and also as a real estate investor.  The only other evidence of what each knew about each other is that they filed joint tax returns.

[44] While Hyland mentioned certain other seminar speakers by name he did not attribute to them any specific statements or lack of qualifications.

[45] By the end of the case, the Defendants put on evidence that the essential elements of their own hard luck stories were in fact true.  The only factual issue that emerged from all the testimony concerning Woolf's hard luck story itself was whether she began to take stock trading courses immediately after her first husband left her or some years later, after her marriage to Trevor Woolf.

brought him to his first TMTT seminar.[46] The Court is therefore left with general testimony that all of the presentations were "similar" or "the same," without any evidence of any common misrepresentations. This evidence is not sufficiently probative to establish that all the TMTT speakers were making the same misrepresentations, or even any misrepresentations.

Moreover, even as to Woolf, Gengler, and Hyland, the evidence showed that their specific alleged misrepresentations were not entirely the same, further undercutting any inference that there was an agreement or other coordination among themselves, with other unidentified TMTT seminar speakers, or with the Company. For example, while the evidence is that all three portrayed themselves as successful, professional traders who "made a living" trading stocks, Woolf used, as examples of her successful stock trades, specific options trades[47] and other anecdotes that were not part of Gengler's or Hyland's presentations. The details of the "hard luck" stories were different, with only the same general claim that they were in bad financial shape before they achieved their success through trading. Hyland testified that he did not always say that he was a highly successful trader but "probably" made that statement, not at the three-day seminar, but rather at the one-day preview session that he taught before becoming a "fulfillment speaker." To the extent that Hyland said he had paid for TMTT courses or a mentor, those statements were true.

With respect to the success rate, there is insufficient evidence to infer that the success rate was known to be untrue by anyone, or that it was false. The only evidence of communications between the Defendants and the Company concerning the success rate is that (1) the speakers

---

[46] Hyland testified that immediately before he took TMTT courses he had just lost his livelihood, his business was failing, and he was desperate to find a way to feed his family.

[47] Based on all the evidence, it appears that some of these examples were literally true, although only as part of an undisclosed larger, generally unsuccessful effort, and that other of these examples were simply not proven to be either true or false.

27

were told to use the success rate by Russ Whitney, the President of the Company, at a Company meeting in 2004;[48] and (2) an e-mail dated December 6, 2005 was sent to speakers advising them to stop using the 96.5% success rate. *See* Gov. Ex. O-3.[49] None of the government witnesses, including its immunized witnesses, testified that the success rate was false.[50] Further, the evidence showed that the seminar speakers did not all define or use the success rate in the same way, undercutting further any inference that there was an agreement or other coordination among Defendants and the Company. For example, Hyland did not use the 96.5% success rate, while Woolf and Gengler occasionally defined "success" differently.

Finally, the government argues that the existence of an agreement to fraudulently market and sell TMTT courses can be inferred from the Company's knowledge that the Defendants were making false misrepresentations in the video recordings of Woolf and Gengler's seminars and

---

[48] The evidence concerning the announcement of the success rate came from Duane Gibbs. Gibbs testified that this announcement took place at a Company-wide meeting, attended by senior management and the in-house legal department, on the occasion of Russ Whitney's introducing the Company's new chief executive officer, who was the former chief executive officer of Kraft Foods. Whitney, then president of the Company, stated at that meeting that the Company had done research and found that 96.5% of the TMTT students who took the Platinum level courses or higher were successful and that seminar speakers should use that statistic.

[49] The only other testimony about the success rate is that on certain occasions after December 2005, Woolf and Gengler continued to use the success rate at their seminars, that Gibbs told them they should not use it, and that eventually they stopped using it. Again, there is no evidence Defendants either knew the other was using the success rate after December 2005 or communicated about it.

[50] In its written opposition to Defendants' Rule 29 motion, the government repeatedly declares that the Company, Russ Whitney, and Defendants knew the success rate was false. The evidence did not support this claim. Gibbs, the longest serving Company employee to testify, Laura Moak, and Alysia Fronk all stated that they assumed the success rate was true and none of them had reason to believe that it was untrue until the December 6, 2005 e-mail. The only witness to testify that he thought before December 2005 that the success rate may have been false was John Hyland. Hyland testified that he did not use the success rate in his presentation because a friend of his in the Company told him he "wouldn't throw around a number like that." Nonetheless, Hyland conceded that he had no evidence that the success rate was untrue; he never told the Defendants that he thought it was untrue; and the Defendants never said anything that would suggest that they thought it was untrue. The government argues that the Defendants must have known the success rate was false based on their own lack of success in the market. The evidence did not establish what TMTT courses the Defendants did in fact take or what trading methodologies they used in connection with their trades and whether they were the same, or more or less advanced and aggressive methodologies than those taught in the TMTT courses. In any event, and as discussed, the Company never provided any definition of "success" and both Defendants had engaged in profitable trades.

the infomercials the Company produced, featuring Woolf and Gengler.[51] There is no direct evidence of that presumed Company knowledge; but the government argues that the Company must have known that Woolf and Gengler were lying in those recordings. The evidence, however, even when viewed in the light most favorable to the government, is insufficient to allow a rational juror to conclude beyond a reasonable doubt that the Company knew that Woolf and Gengler were lying in the recordings, that the Company with that knowledge had agreed to violate the law, or that Gengler and Woolf knew of that agreement and willfully and intentionally joined a conspiracy. There is no evidence concerning the identity of any specific person employed by the Company who heard or reviewed the Defendants' statements in the recordings and the infomercials and knew them to be false.  In fact, there was no evidence that the specific infomercials relied upon were ever actually broadcast.  Even if one assumes that a knowledgeable and accountable Company representative reviewed the recorded statements, there is also insufficient evidence that either Gengler or Woolf said anything on those recordings that the Company representative would have necessarily known to be untrue.[52]  There is also no evidence that either Woolf or Gengler, other than being recorded, participated in any way in the

---

[51] The evidence is that the infomercials were produced by "the Rice Brothers," an independent production company. There is no evidence that the Rice Brothers had any other involvement with the Company. There is no evidence of any communications between the Rice Brothers and Woolf or Gengler or anyone in the Company. The only evidence of any communications between the Rice Brothers and anyone associated with the Company is a conversation between the Rice Brothers and John Hyland during the recording of the infomercial in which Hyland appeared.  The evidence of that conversation is insufficient to infer an agreement between the Company and the Defendants, or anyone else.

[52] The government contends that the Company would have known that Woolf and Gengler were not successful traders.  There is insufficient evidence to support that contention. There is little direct evidence of what the Company in fact knew about Woolf or Gengler.  What a reasonable juror could have inferred from the evidence is that the Company knew that Woolf came out of the Wade Cook organization (which also was in the stock trading seminar business) and that she had been training to become a stock trading speaker with Wade Cook in 1998, before joining the Whitney Company.  Likewise, the evidence supports the inference that the Company knew that before coming to the Company, Gengler was a licensed stock broker with Maverick Trading and that he had been involved with Maverick's Teach Me To Trade program.  The evidence also established that the Company would have known that Gengler appeared in the Maverick infomercial the Company had purchased, that in that infomercial he stated that he had turned $10,000 into $20,000 in two weeks (a statement he also makes in the 2005 Whitney Company infomercial), and that this trade had been verified by Maverick.

planning, editing, review or production of the recordings or infomercials. Finally, even assuming that the Company knew that Woolf and Gengler were making false statements, there is no evidence that the Company communicated that fact to either defendant or that either defendant had reason to think that the Company knew he or she was making false statements. The government has not shown how the Defendants, without this awareness of the Company's hypothetical knowledge of their alleged misrepresentations, could form an agreement with the Company to fraudulently market the TMTT courses. There is insufficient evidence to support a finding that the Company had entered into an agreement to commit a crime with either defendant or anyone else. [53]

In this case, there was no doubt a shared common goal between these Defendants and among these Defendants and the Company, as well as all other seminar speakers and road crews, to sell the TMTT programs. That by itself, however, does not establish an agreement to violate the law. Out of over four million documents that the FBI gathered and reviewed, there are no documents in evidence pertaining to any meetings, conversations, calendar entries, or even file notes that could even begin a chain of reasonable inferences that lead to the conclusion of a conspiracy by Woolf, Gengler, or the Company, or that either defendant knew of such an agreement and knowingly participated in the conspiracy formed by the agreement. For the above reasons, the evidence at the close of the government's case-in-chief, viewed in the light most favorable to the government, is insufficient to support the Defendants' convictions on Count one.

---

[53] Lastly, with respect to the government's claim of a conspiracy between Linda Woolf and her husband Trevor Woolf, the government conceded at oral argument on April 24, 2009, as it must, that it was required to prove that a conspiratorial agreement between the two of them was part of the overall conspiracy alleged in the Indictment between the Company and either defendant or as between the two Defendants. Because there is insufficient evidence that such a conspiracy existed, there is insufficient evidence to sustain Woolf's conviction for conspiracy based on a claimed conspiracy with her husband alone.

**B.    Wire Fraud**

The Indictment also charges Woolf and Gengler with wire fraud in violation of 18 U.S.C.

§ 1343.[54] In order to prove wire fraud, the government was required to present sufficient

evidence to show beyond a reasonable doubt the following factual elements: (1) a scheme to

defraud; (2) a material statement or omission in furtherance of the scheme to defraud; and (3) use

of an interstate wire in furtherance of the scheme to defraud. *United States v. Neder*, 527 U.S. 1,

10 (1999); *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). In order to establish a

scheme to defraud, the government must also prove that the defendants acted with the specific

intent to defraud, which "may be inferred from the totality of the circumstances and need not be

proven by direct evidence." *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993); *see also*

*United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008); *United States v. Godwin*, 272 F.3d

659, 666 (4th Cir. 2001). There is no statutory definition of a "scheme to defraud." Rather, like

fraud itself, a scheme to defraud encompasses broadly any plan that is intended to defraud

through a departure from "fundamental honesty, moral uprightness, or fair play and candid

dealings in the general life of the community." *United States v. Goldblatt*, 813 F.2d 619, 624

(3d. Cir 1987); *see also Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("to

defraud" commonly refers to "wronging one in his property rights by dishonest methods or

schemes").

The government's evidence at the close of its case-in-chief was sufficient to prove that

each defendant, separate and apart from the other, made material misstatements at their

---

[54] The Indictment charges Woolf with wire fraud in Counts two through eight and Gengler in Counts nine through fifteen.

31

respective seminars;[55] that Defendants did so with the intent to defraud;[56] and that Defendants

caused the use of interstate wire transmissions in connection with the sale of TMTT courses at

seminars, as alleged in certain counts in the Indictment.[57] The remaining issue is whether the

Defendants devised or participated in the "the scheme to defraud" alleged in the Indictment.

1.     The "Scheme to Defraud" Alleged in the Indictment

As discussed above, the Indictment alleges only one unitary scheme to defraud and

charges each defendant with having devised the same scheme to defraud.[58] *See supra* Section

---

[55] During its case-in-chief, the government presented evidence of a wide range of statements by the Defendants. At the close of the government's case-in-chief, the Court asked the government in connection with Defendants' Rule 29 motion to identify the specific misrepresentations that it relied on. In response, the government provided the Court with a document entitled "Non Exhaustive List of Misrepresentations." That list consisted of 24 "misrepresentations," although most were not specific misrepresentations but topics such as "salary claim regarding speakers," "salary claim regarding trading mentors," "due diligence regarding trading records," "trading profits generally," "September 11[th] trading claims," "Qualcom trading claims," " Iomega trading claims," "portfolio review," and "credit card script." Three others dealt with Gengler's representations concerning his particular trading profits during his first, second, and third year of trading. Two others dealt with Defendants' statements concerning what they paid for classes, two dealt with statements about Defendants' having paid a mentor, and three dealt with the success rate. The others included "make a living in the market," "professional trader," and "success coaches – all successful traders." Among the statements that the government sufficiently proved were literally false were the statements that Defendants had paid a mentor and that Duane Gibbs was a "successful trader." Other statements were not proven false at all, such as the statements pertaining to the credit card script, some of the specific stock trades, and the claim that a trader can make money whether the market is "up, down, or sideways." Others were shown to be half-truths, such as some of the stock trading claims. Others were too vague to be proven literally false, because they were undefined or susceptible to many different meanings and interpretations. However, when viewed collectively, the jury could find these statements (such as that the defendants were "successful" traders, "professional traders" and that they "made a living in the market") misled customers as to Defendants' level of skill and success as stock traders. *See United States v. Towner,* 665 F.2d 579, 585 (5th Cir. 1982) (holding that half truths and misleading statements are sufficient to support convictions for mail or wire fraud and referencing a list of cases to support the proposition).

[56] Defendants argued throughout this case that they did not have the requisite intent to defraud, relying on what they claim is a fundamental distinction between an "intent to deceive" and "intent to defraud." Defendants argue that there is no evidence of an intent to defraud as a matter of law because there is no evidence that anyone who purchased a TMTT course at one of Defendants' seminars did not get the course that he or she was promised. The Court finds this general contention without merit. Even assuming Defendants are correct that customers "got what they paid for," the evidence was sufficient to prove that each defendant made misrepresentations or misleading statements with the intent to induce the purchase of TMTT courses and services and thereby caused customers to depart with their property, *i.e.,* money.

[57] Defendants stipulated to the use of interstate wire transmissions in connection with certain of the sales alleged in the Indictment.

[58] Indictment at ¶¶ 29-30. The Indictment charges in Counts 2 through 8 that Woolf, "having devised the scheme and artifice to defraud described above," caused certain specified wire transfers as to each count; and in Counts 9 through 15, that Gengler, "having devised the scheme and artifice to defraud described above," caused certain

II.B. At trial, the government described the scheme to defraud as a single, overarching

institutionalized scheme to defraud TMTT seminar customers, orchestrated by the Company, in

which the Defendants played a central, but not the only role. For example, in its opening

statement, the government told the jury that the evidence would show "that these defendants

were part of a bait-and-switch scheme," and that there were many people who were "part of the

overall scheme to defraud" and "just as culpable" as the Defendants but that the Defendants were

at "the center of it." Tr. of Apr. 13, 2009 proceedings (Doc. No. 303) at 8, 14. As the

government summarized its theory to the Court, "[t]he Company was orchestrating and using

fraudulent statements to market the TMTT system to prospective investors across the country."

Gov. Mem. in Opp. to Defendants' Motion for Judgment of Acquittal (Doc. No. 329) at 19-20.

At trial, the government relied on this theory of an overall fraudulent scheme,

orchestrated by the Company, centrally involving the Defendants, but broader and not limited to

the Defendants, to justify the admission of evidence that would have been inadmissible as to one

or both Defendants had Defendants' culpability been based on the existence of separate, discreet

schemes devised by each defendant, independent of the other. For this reason, the Court

repeatedly stated during the trial its understanding that the government was alleging "an overall

scheme" involving the Defendants and the Company in order to justify the admission of certain

evidence. The Court repeatedly identified the need for evidence of a "tie-in" or "connective

tissue" between any illegitimate Company practices and these Defendants for that purpose; and

the government, in response, repeatedly assured the Court that evidence would be forthcoming to

---

specified wire transfers as to each count. The scheme to defraud "described above" was the single unitary scheme to
defraud. The Indictment's only description of the conduct that constitutes the scheme to defraud is listed under the
section of the Indictment labeled "manner and means of the conspiracy and the scheme to defraud." The events and
conduct described in that section are alleged to be "part of the conspiracy and the scheme to defraud." The
described scheme revolves around the conduct of "the defendants," without qualification and without any
differentiation. *See* Indictment at ¶¶ 12-27.

connect these Defendants to the alleged overall scheme.[59]  In the end, the government essentially

conflated the scheme to defraud with the alleged conspiracy and  took the position that the

alleged conspiracy and the alleged scheme to defraud were both proven by the same evidence

and were essentially one and the same, with very little "light" or "distance" between them.[60]

Finally, in determining the contours of the alleged scheme to defraud for the purpose of

evaluating the sufficiency of the evidence as to the wire fraud counts, the Court finds significant

that the government charged both Defendants with substantive wire fraud counts in the same

indictment. Under Federal Rule of Criminal Procedure 8(b), the government is permitted to join

defendants in one indictment only "if they are alleged to have participated in the same act or

transaction, or the same series of transactions, constituting an offense or offenses," even though

"[t]he defendants may be charged in one or more counts together or separately." Fed. R. Crim.

P. 8(b).  Courts addressing Rule 8 have made clear that Defendants may not be joined in a single

indictment, no matter how similar their conduct or their offenses, unless it is alleged that they

have acted jointly as part of some joint criminal venture, undertaking, or enterprise.  In this

regard, Rule 8(b) essentially requires, as Rule 8(a) does explicitly, that the jointly charged

---

[59] For example, during the testimony of John Hyland and Gerald Abrams, both of whom conceded that they never told the Defendants or the Company that they were lying to students, the Court expressed concerns over whether there was a sufficient connection between these witnesses and the Defendants to permit admission of their testimony.  In response, the government confirmed that the testimony was admissible since these witnesses were part of the same overall scheme.  A similar exchange occurred with respect to the testimony of government witness Betty Louder when the government sought to introduce evidence that the Company had refused her a refund when she was unable to attend a course that she had purchased.  Even though the Defendants had no involvement with the refund process, the government justified the introduction of this testimony on the grounds that it was probative of whether or not the Company had an "illegitimate purpose."

[60] At oral argument on Defendants' Rule 29 motions at the close of all the evidence on May 5, 2009, the government took the position that the conspiracy and the alleged scheme to defraud were essentially the same and that it was "hard-pressed" to think of any evidence that was admissible because of the alleged conspiracy that would not have been admissible because of the alleged single, overarching scheme to defraud.  In its oral and written arguments concerning Defendants' Rule 29 motion, the government candidly concedes that the conspiracy and the scheme to defraud are essentially one and the same.  See, e.g., Gov. Mem. in Opp. to Defendants' Motion for Judgment of Acquittal (Doc. No. 329) at 28 ("In this case the evidence clearly established that the Defendants participated in a scheme designed to defraud potential TMTT investors.  The scheme is outlined in the Statement of Facts and in the previous section describing the evidence of the conspiracy to commit mail and wire fraud.").  The government also told the jury in closing argument that the same evidence that proves the conspiracy proves the scheme to defraud.

34

defendants engage in conduct that is "connected with or constitute[s] parts of a common scheme or plan." Fed. R. Crim. P. 8(a). *See United States v. Chinchic*, 655 F.2d 547, 551 (4th Cir. 1981) ("Although the government alleged a common scheme, it failed to offer any evidence in support of that theory."); *United States v. Whitehead*, 539 F.2d 1023, 1025 (4th Cir. 1976) ("Although there was a 'series' of transactions involving a common denominator, the government did not meet its burden of proving that there was any connection between appellant's offense and Meredith's offense."). For these reasons, the government properly charged the Defendants in the same indictment with substantive counts of wire fraud only if the allegations are read to allege a single scheme to defraud, jointly devised or participated in by the Defendants, presumably as part of the alleged conspiracy. As discussed above, this type of overarching scheme, orchestrated by the Company, is precisely what the government described throughout this case as the scheme alleged in the Indictment.

2.    Evidence that Defendants Devised or Participated in the Scheme to Defraud

The issue, then, is whether the evidence is sufficient to prove that Defendants devised or culpably participated in the alleged single, overarching scheme to defraud. The Court concludes that the evidence is not sufficient for that purpose since the evidence did not sufficiently connect the two Defendants to a single criminal enterprise or undertaking. There is insufficient evidence to establish that they engaged in any of the allegedly illegal conduct except on their own, separate and apart from any culpable knowledge or participation by the other or at the direction of the Company. *See, e.g., United States v. Wilson*, 506 F.2d 1252 (7th Cir. 1974) ("The [district] court stated that before a finding of membership could be made 'the evidence in the case must show beyond a reasonable doubt that the joint enterprise was knowingly formed and that defendant or any other person who is claimed to have been a member willfully participated

35

in the unlawful plan with the intent to advance or further some object or purpose of the joint enterprise.").

The evidence in this case is undisputed that during the relevant period, the Whitney Company was a publicly traded company with many levels of management, an in-house counsel's office, and hundreds of employees together with dozens of road crew members and speakers. Neither Woolf nor Gengler was an employee, officer, or director of the Company, and neither of them had any managerial responsibilities with respect to the overall administration or marketing of the TMTT programs. Except for joint appearances at seminars in December 2002, shortly after they both first associated with the Company, Woolf and Gengler never appeared at seminars together. As alleged in the Indictment, they were independent contractors. They conducted their seminars without the involvement of the other and without any financial benefit from the other's seminars.   While the Defendants and the Company were all involved in what could be characterized as a "scheme" or a "plan" to market and sell TMTT courses, as with the conspiracy charge, there can be no reasonable inference of their joint participation in a fraudulent scheme based on the mere fact that they had associated together or were together involved in the normal incidences of a legitimate business. *See United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988).

Likewise, the government did not introduce any documentary evidence or electronic communications from which an overall fraudulent scheme could be inferred. An FBI investigation of the Company had been on-going for over two years during which millions of Company documents and electronic files had been reviewed. During its case-in-chief, the government introduced one e-mail from this investigation dated December 6, 2005 that told seminar speakers, including Woolf and Gengler, to stop using the 96.5 % success rate, until it

36

could be further verified and the excerpts of video taped presentations and the two infomercials previously discussed. There were no documents introduced from which a juror could reasonably conclude that Woolf or Gengler knew that the products that they were selling were fraudulent in content or even incorrect, or that the products would not be provided or were ever not provided when purchased. In short, there was not a single e-mail, letter, or communication, oral or written, between any two Company employees, between a Company employee and Woolf or Gengler, or between Woolf and Gengler concerning the marketing of TMTT courses or programs, or anything else, from which a rational juror could infer the existence of a common, unitary scheme to defraud. Nor did the government put on as a witness any Company executive who designed, operated, marketed, controlled, or was even managerially involved in the TMTT marketing program. Instead, the government's evidence to prove the fraudulent scheme focused on the role of the road crews, the statements each defendant made about the road crew, and the interactions the road crews had with the Defendants. Missing from all of that testimony, however, is any evidence of any coordination between the Defendants, or any link between anything a defendant did or said that was fraudulent and any direction from the Company to say or do it.[61]

---

[61] Implicitly recognizing the need for evidence connecting the Defendants and the Company in a single overall scheme, the government in its post trial written opposition to Defendants' Rule 29 motion makes a variety of evidentiary claims, in addition to those discussed *supra*, that are not supported by the evidence. Among them are that (1) "Woolf created the PowerPoint presentation that all speakers used at the sales seminars;" (2) Woolf trained John Hyland and co-spoke with him at seminars; (3) Woolf and Gengler knew that the trading mentors were not "highly scrutinized;" (4) Hyland, Gibbs, Abrams, and Moak admitted their involvement in "the overall scheme to defraud;" and (5) "Woolf essentially admitted her involvement to Laura Moak when Woolf called her after this prosecution began and told her they all needed to get attorneys and stick together or they were all going down together." There was an absence of evidence as to items (1) – (3). As to item (4), Hyland and Abrams testified that they never told the Company or the Defendants that they were engaged in anything fraudulent and they had no reason to think that the Defendants said anything untrue. Gibbs flatly denied that he was part of a conspiracy to commit fraud or that he was trying to defraud anyone. He did admit that he thought that students relied on the description "professional trader." Moak likewise denied that she was part of a scheme to defraud, but did admit that she felt "uncomfortable" with being described as a "successful trader," even though she did trade. There is no evidence that either Gibbs or Moak ever shared these subjective beliefs with either defendant or the Company's management. As to item (5), Moak testified that it was Woolf's lawyer, not Woolf, who made the remark that if

There was also insufficient evident for a jury to conclude that a single scheme to defraud existed solely as between Woolf and Gengler. As detailed with respect to the conspiracy charge, and as the FBI investigation confirmed, other than their brief contacts with each other in December 2002, Woolf and Gengler did not work together and did not share commissions. The government presented the theory that these Defendants were critical to the success of the overall scheme orchestrated by the Company, but there was no evidence of even a single conversation, letter, or e-mail—not even a wink or a nod—from which it could be inferred that Woolf and Gengler had jointly devised a fraudulent scheme or that one had devised a fraudulent scheme and the other knew about it and willingly participated in it. For all these reasons, the government's evidence, when viewed in the light most favorable to the government, was insufficient for a rational juror to conclude beyond a reasonable doubt that Defendants had devised or culpably participated in the unitary scheme to defraud alleged in the Indictment.

## C.    Variance

Having concluded that the evidence is insufficient to sustain Defendants' convictions based on the scheme to defraud alleged in the Indictment, the Court must consider whether the evidence is sufficient to sustain their convictions for wire fraud based on each defendant's own discreet, individual scheme to defraud, separate and apart from the other. In other words, the Court must consider whether the government's failure to prove the common scheme alleged in the Indictment is simply a non-fatal variance that did not prejudice the substantial rights of Defendants. *See Berger v. United States*, 295 U.S. 78 (1935).

"The Fifth Amendment . . . guarantees that a criminal defendant will be tried only on charges in a grand jury indictment. Therefore, only the grand jury may broaden or alter the

---

Woolf was "going down, everybody's going down" when he called to interview her. The balance of the statement Moak attributes to Woolf is insufficient to prove either her involvement in a conspiracy or the alleged scheme to defraud.

charges in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (citing

*Stirone v. United States*, 361 U.S. 212, 215-17 (1960)). An indictment is "constructively

amended . . . [if] either the government (usually during its presentation of evidence and/or its

argument), or the court (usually through its instructions to the jury), or both, broadens the

possible bases for conviction beyond those presented to the grand jury." *United States v.*

*Sampson*, 140 F.3d 585, 589-90 (4th Cir. 1980) (quoting *United States v. Floresca*, 38 F.3d 706,

710 (4th Cir. 1994) (en banc)). A constructive amendment, which constitutes a so-called "fatal

variance," violates the Fifth Amendment right to be indicted by a grand jury and is *per se* error.

*Randall*, 171 F.3d at 203. However, not every difference between the indictment and the trial

evidence results in a fatal variance. The test is whether the evidence presented at trial "change[s]

the elements of the offense charged, such that the defendant is actually convicted of a crime

other than that charged in the indictment." *Id.* When the trial evidence does not alter the crime

charged in the indictment, a "mere variance" or "non-fatal" variance occurs, and the defendant's

constitutional rights are not violated unless the variance "prejudices the defendant either by

surprising him at trial and hindering the preparation of his defense, or by exposing him to the

danger of a second prosecution for the same offense." *Id.* Here, the variance between the proof

at trial of wire fraud based on distinct, separate schemes to defraud, particular to each defendant,

and the single, unitary scheme to defraud alleged in the Indictment does not constitute a "fatal"

variance since the crimes presumptively proved at trial and alleged in the Indictment are the

same. The issue is whether this non-fatal variance substantially prejudiced the rights of the

Defendants.

The government clearly made the tactical decision to proceed against these Defendants

jointly and, in order to do so, fashioned a theory of liability necessarily predicated on a single,

joint criminal undertaking to defraud TMTT customers. Based on that theory, the government utilized the substantial tactical and evidentiary advantages that its theory allowed. It argued that otherwise inadmissible evidence should be admitted, assuring the Court that by the end of its case there would be evidence of such a scheme and Defendants' culpable participation in it. It would be fundamentally unfair for these Defendants to be convicted based on separate and unconnected claims of wire fraud as a result of a trial that was conducted based on a different theory, during which the jury heard substantial evidence that it would not have heard had each defendant been tried separately based on an individualized theory of criminal conduct. Based on the entire record in this case, the Court finds that the variance in proof and the Indictment prejudiced the substantial rights of the Defendants; and that the Defendants' convictions may not be sustained under any construction of the evidence.

This case presents issues similar to those addressed in *United States v. Camiel*, 689 F.2d. 31 (3d Cir. 1982). In *Camiel*, the government charged several defendants with mail fraud based on allegations of a single unitary scheme. The trial court found that the proof at trial showed, at most, multiple schemes to defraud rather than the single common scheme to defraud alleged in the Indictment. The trial court also found that this variance prejudiced the substantial rights of the defendants and that, rather than a new trial, the only proper remedy was a judgment of acquittal. The Third Circuit affirmed. Applying the two prong test articulated in *Kotteakos v. United States*, 328 U.S. 750 (1946),[62] the Court of Appeals found that there was evidence of separate distinct schemes but not of a single unitary scheme. The Court also agreed that evidence of multiple schemes worked to prejudice the substantial rights of the defendants because even if there had been sufficient evidence to convict any one of the defendants based on

---

[62] Under the test laid down in *Kotteakos v. United States* 328 U.S. 750 (1946), in order to reverse a conviction based on the theory of a variance, there must first be a variance between the indictment and the proof at trial, and second, the variance must prejudice a substantial right of the defendant.

that defendant's involvement in his particular scheme, the volume and manner of presentation of the evidence created the likelihood of "spill-over," that is, evidence was admitted that raised the possibility that the jury might have been unable to separate offenders and offenses and transferred the guilt from one alleged co-schemer to another.

As to an appropriate remedy, the Third Circuit found that a judgment of acquittal, rather than a retrial was appropriate, since "it is the indictment itself that is the root cause of the prejudicial variance, it is the indictment itself whose breadth allows for, even encourages, the full range of evidence offered at the trial below, it is the indictment itself that is fatally flawed." *Id.* at 39. The Court observed that even if it sought to limit a retrial in a "highly compartmentalized fashion so that only evidence of a particular scheme could be introduced against the appropriate defendants," a new trial with the possibility of severance could not cure the flawed indictment since such a structured trial would require a Grand Jury to return indictments against the individual defendants based on discreet schemes. The Court could not "speculate on whether the Grand Jury would have indicted the individual defendants had it realized the indictment as written was overbroad . . . . [No] court may speak for the Grand Jury." *Id.* at 40. The Court, therefore, concluded that it did not have the authority to order a new trial based on individual schemes; and the only alternative was judgments of acquittal.

As in *Camiel*, this case involved the government's allegations of a single, joint or common scheme to defraud against multiple defendants. Given the similarities between the schemes personal to Defendants and the government's claim of a single, joint or common scheme, the jury could not reasonably be expected to compartmentalize the evidence and consider separately only the evidence relevant to determining the guilt or innocence of each defendant. Accordingly, a spill-over occurred and Defendants were prejudiced significantly.

For example, the government presented the testimony of Gerald Abrams and John Hyland, who confessed to their own wrongdoing though they had no material connection to either defendant. John Hyland—who pled guilty to a false statement to the Securities and Exchange Commission during its investigation of the Company—testified that he never informed Defendants or the Company that he was engaged in any improper or illegal conduct.  Likewise, Gerald Abrams, the only trading mentor to testify, never met or had conversations with either Gengler or Woolf concerning what he claimed were his own misrepresentations to his students.

The government's broad theory of a single conspiracy and scheme that included the Company and both Defendants was also at the root of the difficulty that the Defendants faced in calling witnesses to rebut the government's claims.  In order to rebut the government's unitary conspiracy and scheme to defraud theory, the Defendants had subpoenaed for the trial a wide range of persons associated with the Company, including senior executives, trading mentors, road crew members, secretaries, and low level office personnel. The Defendants complained throughout the trial that their ability to defend against the charges of a Company orchestrated conspiracy and scheme to defraud was crippled by the government's telling those potential defense witnesses that they remained at least "subjects" of the government's on-going, but suspended Grand Jury investigation into the Company.[63]  The government refused to give immunity or any assurances of non-prosecution to any of the witnesses associated with the Company that the defense had subpoenaed.  As a result, all of the persons associated with the

---

[63] The government represented that once the Indictment was returned, it suspended any further grand jury proceedings with respect to the Company's activities.

Company that the Defendants wished to call refused to testify based on their Fifth Amendment privilege, even if these witnesses thought that they were not involved in any wrongdoing.[64]

The government attempted, albeit unsuccessfully, to prove the existence of the common unitary scheme alleged in the Indictment, with all the evidentiary and procedural benefits that flowed from that theory, and in the process substantially prejudiced the Defendants with respect a conviction on any theory of distinct, multiple schemes, each limited to a particular defendant. The Court therefore finds that the interests of justice would not be served by sustaining the Defendants' convictions on the basis of separate, discreet, individualized schemes to defraud, unconnected to each other, or by retrying this case based on this alternative legal theory, which could not have been properly pled in this Indictment returned against both Defendants. For that reason, a severance and a new trial cannot adequately address the infirmities of this prosecution. The Court has already concluded that the evidence is insufficient to convict the Defendants based on the conspiracy charge and the overall single scheme alleged in the Indictment, and a new trial based on those theories would be improper. A new trial under this Indictment based on the theory of separate and distinct schemes particular to each defendant would compromise the

---

[64] By way of example, one of the subpoenaed witnesses that defendant Woolf wished to call was the husband of government witness Alysia Fronk. After Ms. Fronk began to testify, the Court suspended her testimony and appointed a lawyer to advise Ms. Fronk concerning her rights as a witness, even though the government advised the Court that Ms. Fronk was not a "target" or a "subject" of the government's continuing investigation into the Company, she was not an unindicted co-conspirator, and she had no "exposure." After consulting with her lawyer, the government granted Ms. Fronk immunity and she completed her testimony. Once the government learned that Woolf intended to call Ms. Fronk's husband, the government advised Ms. Fronk's husband's lawyer that he was a "subject" of the continuing investigation, even though the government conceded that he played no greater role in the Company than Ms. Fronk and the government had no specific information that he was involved in any wrongdoing. Nevertheless, the government refused to grant immunity to the husband or otherwise assure him that he did not face prosecution and the husband refused to testify based on his Fifth Amendment privilege. Defendants complained that they were entitled to relief based on the government's position, relying principally on the discussion in *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2000). The Court heard extensive argument on this issue and held three separate hearings with respect to whether there was a proper invocation of the Fifth Amendment privilege by witnesses defendant Woolf subpoenaed and called to testify, as well as whether the Defendants were entitled to any relief as a result of the government's positions. The Court found a sufficient basis for each of the witnesses that were the subject of the hearings to invoke their Fifth Amendment privilege. The Court also found that there was not a sufficient basis upon which to grant any relief to the Defendants based on their claims that their ability to present a defense had been unfairly prejudiced by the government's refusal to grant immunity to any of those witnesses.

grand jury process and its protections. As in *Camiel*, the fundamental problem at trial was not the lack of a severance but the Indictment itself.

There can be no doubt that Defendants' seminar presentations were hardly models of probity. They deftly exploited the hopes and aspirations of a vulnerable audience through half-truths, misleading statements, and, in certain instances, an outright falsehood. The issue before the Court, however, is not whether the Defendants engaged in any wrongdoing, but whether the Defendants engaged in the wrongdoing alleged in the Indictment. The theory that the government indicted on and rode throughout the case led to an evidentiary dead-end; and this Court is obligated to recognize the consequences that necessarily flow from those prosecutorial decisions in order to preserve the integrity of the criminal process.

**D.     Conditional Ruling on Defendants' Motion for New Trial**

Pursuant to Rule 29(d)(1), this Court is required to determine whether a motion for a new trial should be granted in the event that its judgment of acquittal is vacated or reversed. For the reasons stated herein, the Court determines that in the event this decision granting Defendants' motion for judgment of acquittal is vacated or reversed, a motion for a new trial should be granted.

A district court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The court's authority under Rule 33 "is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence—namely the court may evaluate the credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985) (citing *Tibbs v. Florida*, 457 U.S. 31, 38 n.1 (1982)). "Under the applicable legal principles, a trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstances when the evidence 'weighs

44

heavily' against it." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). A jury verdict may also be overturned "when substantial prejudice has occurred." *United States v. Jones*, 542 F.2d 186, 211 (4th Cir. 1976). In determining whether evidence is prejudicial, "[t]he general standard . . . is whether there is a reasonable possibility that the jury's verdict was influenced by material that improperly came before it." *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984) (internal quotations omitted); *see also United States v. Lentz*, 383 F.3d 191, 219 (4th Cir. 2004).

The Court finds that should its judgment of acquittal be reversed or vacated the interests of justice require a new trial based on its jury instructions, the "spill-over" of evidence, and the Defendants' joinder.

      1.    <u>Jury Instructions</u>

A judgment should be reversed where an error associated with the jury instructions "is prejudicial based on a review of the record as a whole." *United States v. Moye*, 454 F.3d 390, 399 (4th Cir. 2006) (internal quotation marks omitted); *see also United States v. Hurwitz*, 459 F.3d 463, 481 (4th Cir. 2006). Upon review of the Court's instructions, the Court concludes that the jury was not instructed adequately to protect against the possibility that the jury might convict based on Defendants' participation, not in the single, joint scheme alleged in the Indictment, but based on unconnected, separate, and distinct schemes to defraud not alleged in the Indictment. The instructions, when read with this possibility in mind, did not state explicitly, or by clear implication, that in order to return a guilty verdict the jury must find beyond a reasonable doubt that the single unitary scheme to defraud existed and that each defendant knowingly devised or participated in that scheme to defraud. Likewise, in the event it would have been proper to convict on either the single scheme theory or a multiple scheme theory, the

45

instructions did not adequately instruct the jury as to the need to decide unanimously on

conviction based on the same scheme theory.

       The relevant instructions to the jury provided as follows:

       <u>Instruction No. 13</u>:  The defendants, Linda Woolf and David Gengler, are not on trial for any act or conduct not specifically charged in the indictment.

       <u>Instruction No. 20</u>:  The indictment alleges a number of separate means or methods by which the defendants are accused of violating the law.
       The government is not required to prove all of the means or methods alleged in each count of the indictment.
       Each juror must agree with each of the other jurors, however, that the same means or methods alleged in each count of the indictment was, in fact, engaged in or employed by the defendants . . . .  The jury need not unanimously agree on each means or method, but, in order to convict, must unanimously agree upon at least one such means or method as one engaged in by the defendants.  Unless the government has proven the same means or method to each of you, beyond a reasonable doubt, you must acquit the defendants of the crime charged in each count of the indictment.

       <u>Instruction Nos. 41(as to Woolf) and 42(as to Gengler)</u>:  The indictment charges that on or about the dates listed in the indictment, [Linda Woolf/David Gengler], having devised a scheme and artifice to defraud, and for the purpose of executing the scheme or artifice to defraud, knowingly caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, and sounds . . . .

       <u>Instruction No. 43</u>:  In order to sustain its burden of proof . . . the government must prove each of the following four (4) essential elements beyond a reasonable doubt:

     <u>One</u>:   The defendant knowingly devised and intended to devise or knowingly participated in a scheme or artifice to defraud or to obtain money or property by means of material false or fraudulent pretenses, representations, or promises as detailed in the Substantive Counts of the indictment . . . .

       <u>Instruction No. 45</u>:  The phrase 'any scheme or artifice to defraud' or 'any scheme or artifice for obtaining money or property' means any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value. . . .  A 'scheme or artifice to defraud' includes a scheme to deprive another person of tangible as well as intangible property rights.  Intangible property rights means anything valued or considered to be a source of wealth.

       <u>Instruction No. 52</u>:  When two or more persons knowingly associate themselves together to carry out a common plan or arrangement and intend either to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means, there arises from that association a kind of partnership in which each member becomes the agent of every other member.

So if you find the evidence in the case shows such a common plan or arrangement, then an act knowingly done or a statement knowingly made by a member, which the common plan or arrangement is continuing and done or made in furtherance of some object or purpose thereof, is admissible against all of the members.

In order to establish that such a common plan or arrangement existed, the evidence must show that the parties to the plan or arrangement in some way or manner came to a mutual understanding to accomplish some common object or purpose.

In order to establish that a defendant or any other person was a party to or a member of such a common plan or arrangement, the evidence must show that the plan was knowingly formed and that the defendant, or other person who is alleged to have been a member of it, knowingly participated in it intending to advance or further some common object or purpose of the plan or arrangement.

In determining whether or not a defendant or any other person was a party to or a member of such a common plan or arrangement, the jury is not to consider what others may have said or done. The membership of a defendant or any other person in such a common plan or arrangement, in other words, must be established by evidence as to his or her own conduct — what he himself or she herself knowingly said or knowingly did.

If, and only if, it appears from such evidence in the case that a common plan or arrangement did exist, and that a defendant was one of the members of the plan or arrangement, then the acts and statements by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have been a member. This is true even though the acts and statements may have occurred in the absence of and without the knowledge of the defendant . . . .

Otherwise any admission or incriminatory statement made or act done by one person outside of court may not be considered as evidence against any person who was not present and saw the act done or heard the statement made.

*See* Jury Instructions (Doc. No. 294-8).

The jury instructions, when read as a whole, inform the jury that they must find that each defendant "knowingly devised and intended to devise or knowingly participated in a scheme or artifice to defraud . . . as detailed in the Substantive Counts of the indictment." *Id.* at No. 43. Although the instructions generally inform the jury that Defendants "are not on trial for any act or conduct not specifically charged in the indictment," *id.* at No. 13, they do not inform the jury that the Indictment requires that the jury find that the single common scheme to defraud existed and that each defendant devised or participated in that same scheme to defraud. *See, e.g., United States v. Mastelotto*, 717 F.2d 1238, 1247 (7th Cir. 1983) ("In a mail or wire fraud case in which a defendant contends that a variance has occurred between the single scheme charged in each

47

count of the indictment and the proof at trial, the jury must be instructed that each of the jurors must find the defendant guilty of participation in the same single scheme to defraud *and* that the scheme to defraud in which the defendant is found to have participated is the same scheme as the overall fraudulent scheme alleged in the indictment.") (overruled on other grounds by *United States v. Miller*, 471 U.S. 130 (1985)). In fact, Instruction No. 52 both reflects the government's single scheme theory and also implies that it is not necessary for the jury to find a "common plan or arrangement" or that Defendants "knowingly associate[d] themselves together." *Id.* at No. 52. Similarly, the jury instructions were inadequate if this Court's judgment of acquittal is reversed or vacated on the grounds that the Indictment did not require a finding that Defendants devised or culpably participated in a single, common scheme, but rather allowed conviction based on a single common scheme or separate schemes.

This case is similar to that addressed by the Third Circuit in *United States v. Dobson*, 419 F.3d 231 (3d Cir. 2005). In *Dobson*, the jury instructions did not adequately protect against the possibility that the jury might base its finding of guilt of mail fraud on statements that were not an actionable basis for mail fraud as a matter of law. *Id.* at 241. The Third Circuit found that the jury instructions did not convey an essential aspect of the "knowledge element of the fraud charged." Specifically, the Third Circuit found that "[t]he District Court's instruction nowhere advised the jury that it could convict only on finding that Dobson in fact *knew* of [her employer's] fraudulent scheme." *Id.* at 238 (emphasis added). For that reason, the court found that "we have no means of knowing on what basis the jury convicted Dobson of mail fraud: it could have done so properly on the basis of some direct or circumstantial evidence that Dobson knew and participated in the overall fraudulent . . . scheme . . . or it could have done so on the abundant evidence of Dobson's dubious sales presentations that, while no doubt unsavory, are

48

insufficient to support the mail fraud charges alleged in the indictment." *Id.* at 241. Here, as in *Dobson*, we have no means of knowing what scheme to defraud the jury found Defendants to have devised or participated in.

      2.    "Spill-Over" of Evidence and Joinder

This Court would also require a new trial on the basis of the "spill-over" of evidence and prejudicial joinder of Defendants. Evidence was admitted at trial that would not have been admitted in the absence of the conspiracy charge and the claim of a single, broad, overall scheme. Moreover, given the evidence of similarities between the schemes personal to Defendants and the government's claim of a single, joint, or common scheme, the jury could not reasonably compartmentalize the evidence and consider separately only the evidence relevant to determining the guilt or innocence of each defendant. *See supra* Section III.C. In addition, because of the conspiracy and single scheme charged, each defendant was substantially prejudiced by the presence at trial of the other and evidence and arguments particular to the other.

During the trial, the government offered, and the Court admitted, certain evidence on the grounds that the government would later introduce evidence that established the conspiracy or single, joint scheme that justified its admission. For example, as discussed *supra*, witnesses, unconnected in any material way to the Defendants, were permitted to testify as to their own wrongful conduct, justified only by the alleged conspiracy and fraudulent scheme.[65] The jury was permitted to hear this evidence even though, in the end, the government failed to produce evidence sufficient to prove the overall conspiracy and scheme it relied on to justify its introduction. Based on the same claims of an overall scheme and conspiracy, the Court

---

[65] These witnesses included John Hyland, and Gerry Abrams who testified that they never worked with either defendant and never told either defendant that they were engaged in anything improper.

permitted extensive hearsay evidence concerning, *inter alia*, the Company's telephone coaching services and refund practices, even though neither defendant had any involvement in those activities.

Both parties were also impacted by the other's joinder as a co-defendant. First, by their mere presence together in the courtroom, with their counsel necessarily conferring and coordinating their defense in the presence of the jury, the jury likely assumed an association in fact between the Defendants that the evidence did not support. Moreover, the jury heard as to both Defendants the statements and instances of conduct that involved only one of them, something that was proper only in the event that the government had put on sufficient evidence to establish the alleged conspiracy and scheme that allegedly bound them together. Some of those statements and instances of conduct had the potential to be highly inflammatory with a jury, such as the government's evidence and jury argument that Woolf profited in her trading as a result of the events of 9/11 and the government's closing argument that Woolf, through her counsel, had concealed her trading records.[66] The jury impact of the government's charge of concealment on Woolf's part was no doubt compounded when the government raised the specter that it had additional evidence of guilt but chose not to present it. On that point, in its rebuttal to the jury, the government referenced "the information that's not before you" and argued that "we could be here all month for me [government counsel] to talk to you about everything we know that's not in evidence." The government also underscored this claimed concealment on Woolf's part when it told the jury that the Defendants were the ones "hiding the ball," and that it was the

---

[66] Woolf's counsel refused to produce in pre-trial discovery pursuant to Fed. R. Crim. P. 16 certain stock trading records, taking the position that since he did not intend to use them in Woolf's case-in-chief, there was no obligation to produce them as part of reciprocal discovery under Rule 16(b). When Woolf's counsel called Woolf to the stand, the government renewed its request for her trading records and the Court ordered production not pursuant to Rule 16, but Fed. R. Evid. 612, after Woolf's counsel confirmed that Woolf had refreshed her recollection with them. In its rebuttal closing argument, the government made an issue of the decision by Woolf's counsel not to produce the trading records until ordered to do so under Rule 612.

government that subpoenaed information and "has done everything it can in this case to give you all of the evidence," a problematic proposition given the difficulties that Woolf experienced in calling her subpoenaed witnesses, as discussed above. Woolf was also no doubt impacted to some degree in the eyes of the jury when Gengler chose to testify and she decided not to,[67] and also when the government argued in closing argument that Gengler had committed tax fraud.[68] Based on the entire trial, the Court concludes that a new trial is warranted should its judgment of acquittal be reversed or vacated.

## IV. CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for a judgment of acquittal and, should this Court's ruling be reversed or vacated, the Court further conditionally grants a new trial.

An appropriate Order will issue.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 23, 2009

---

[67] When Woolf produced the trading records pursuant to the Court's order as Woolf was about to testify, the government requested a recess in order to review the documents, verify their authenticity and subpoena other trading records from the same source, which the Court granted. This government request for a recess was accompanied by Woolf's own request for a recess because of her inability to testify due to her emotional condition at the time. Before granting either party's request for a recess, the Court interviewed Woolf in Chambers, on the record *ex parte*, with her defense counsel, and determined that Woolf's emotional condition substantially affected her ability to testify at that time. When the Court reconvened following the recess, Woolf stated on the record her decision not to testify.

[68] During its cross examination of Gengler, the government accused him of tax fraud based on tax deductions relating to his claimed business use of his Porsche Cayenne, and in closing argument told the jury, "he's either lying here in court or he lied on the tax form. Either way he's lying."